UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KENDRA J. RAUB, o.b.o. H.S.J.,
                     Plaintiff,

v.
                                                  **REPORT and RECOMMENDATION**

                                                  15-CV-150A

CAROLYN COLVIN, Acting Commissioner
of the Social Security Administration,
                     Defendant.

_____

## INTRODUCTION

This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including the preparation of a Report and Recommendation on dispositive motions. [8].[1] This is an action brought pursuant to 42 U.S.C. §405(g) to review the final determination of the defendant Acting Commissioner of the Social Security Administration that plaintiff was not entitled to Social Security Supplemental Security Income benefits ("SSI"). Before me are the parties' cross-motions for judgment on the pleadings [7, 13].

For the reasons stated below, I recommend that the determination of the Acting Commissioner be affirmed.

## PROCEDURAL BACKGROUND

Plaintiff Kendra Raub, on behalf of her son H.S.J., filed an application for SSI on June 11, 2011 (T. 164).[2] The application for benefits was denied (T. 64), and an administrative hearing was subsequently held before Administrative Law Judge ("ALJ") William E. Straub on

---

[1]     Bracketed references are to the CM/ECF docket entries.

[2]     References denoted as "T" are to the pages of the administrative transcript.

June 10, 2013 (T.36). On July 18, 2013, ALJ Straub determined that plaintiff was not disabled as defined in the Social Security Act (T.17-29). The Appeals Council refused to alter that determination on December 17, 2014, making the ALJ's determination the final decision of the Acting Commissioner (T. 1). The plaintiff thereafter commenced this action.

## BACKGROUND

H.S.J. was born in 2008 (T. 164). It is alleged that he became disabled on June 7, 2011 (id.) due to a cortical visual impairment, nystagmus[3], gastrointestinal problems, a muscular disorder and a learning disability (T. 180). H.S.J.'s Opthalmologist, Dr. Matthew Gearinger, stated that the nystagmus is caused by a mild to moderate foveal[4] hypoplasia[5] of his macula (T. 561). He was four years old at the time of the administrative hearing (T. 41).

The medical record reflects that H.S.J. has been seen by his pediatrician, Dr. Mohamad-Zahi Kassas, on more than 100 occasions for constipation, diarrhea, gastroenteritis, and various fevers, insect bites, rashes and respiratory infections (T. 306-488, 599-640, 676-700, 723-34). EMGs to check for epilepsy or a seizure disorder were negative (T. 302, 661). A test to rule out Hirschsprung disease[6] was also negative (T. 273). A chest x-ray performed on November 4, 2008 found his heart and lungs to be normal (T. 296). A CT dated September 18, 2008 and an MRI dated February 27, 2009 revealed no abnormalities in H.S.J.'s brain (T. 294). A June 27, 2012 hearing test found his hearing to be within normal limits (T. 653-54).

---

[3] "[A]n involuntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component." Stedman's Medical Dictionary (28th Edition 2006).

[4] A fovea is "a natural depression on the surface of the body". Stedman's Medical Dictionary.

[5] "[A]n underdevelopment of a tissue or organ." Stedman's Medical Dictionary.

[6] Hirschsprung disease is a synonym for a congenital "megacolon", which is an extreme dilation of the colon. Stedman's Medical Dictionary.

A chromosome microarray on April 2, 2010 found two interstitial deletions but noted that no clinically established disorders have been reported relating to these imbalances (T. 529). It was suggested that "this could change as studies progress". Id.

On October 26, 2010, H.S.J.'s mother complained that his nystagmus was worsening and that H.S.J. was constantly complaining that he was tired and did not feel well (T. 345). Dr. Kassas reported that he "did not see any of what Mom was complaining about. [H.S.J.] was very happy and jumpy today. He was trying to climb up and down the exam table. He was full of energy and showed no signs of malaise" (T. 346). On January 11, 2011, Dr. Kassas described H.S.J. as a "healthy appearing child, well-nourished and alert. He is running around the room playing, talking and enjoying himself. He seems to be at home, shows no anxiety, answered my questions attentively" (T. 335).

On September 22, 2010, in response to an inquiry by H.S.J.'s father, Dr. Kassas stated that H.S.J. was not blind, and that "he was able to see, but his visual acuity was reduced. The extent of that reduction is not clear yet" (T. 352). On April 13, 2011, H.S.J. underwent an operation on both eyes to address the nystagmus (T. 270). On January 24, 2013, H.S.J.'s mother reported that his nystagmus was worsening (T. 707).[7]

A BOCES pre-school psychological evaluation by Dr. Kevin Eagan, dated December 8, 2010 (T. 763-68), suggested that H.S.J. was experiencing a moderate cognitive delay and that he would benefit from academic enrichment activities (T. 766-67).[8] H.S.J. was examined by Dr. Kassas on August 4, 2011 for complaints by his parents that he was throwing

---

[7] The record does not reflect what, if any, additional treatment was ordered based upon the report by H.S.J.'s mother.

[8] Dr. Eagan also recommended that plaintiff and her fiancé should consider a support group for parents of children with involved medical needs (T. 768).

temper tantrums and was often defiant (T. 629). Dr. Kassas noted that "none of that behavior is seen in public or at school". Id.

A teacher questionnaire completed by Tina Pensyl on July 27, 2011 states that H.S.J. receives a special session once a week to address vison issues (T. 216). She stated that he has no problems acquiring and using information (T. 217). Ms. Pensyl reported that H.S.J. has only slight problems on some occasions attending and completing tasks, and that he "is independent most of the time. During art [H.S.J.] uses a slant board for assistance with his vision". Id. Ms. Pensyl stated that H.S.J. had no problems interacting and relating with others (T. 219), no problem moving about and manipulating objects (T. 220), and no problems caring for himself (T. 221). She did note that he has "weak/low tone muscles" which gave him difficulties on walks (T. 222).

A speech/language evaluation dated March 3, 2011 suggested that H.S.J.'s speech and language skills were in the average range for his development age and that no speech/language services were recommended (T. 256).[9]

On August 10, 2011, H.S.J. was consultatively examined by Dr. Joseph Prezio (T. 564). Upon examination, Dr. Prezio found H.S.J.'s eyes to be "normal appearing", able to follow a moving light, and concluded that his vision "appears grossly normal for age" (T. 566). He stated that based upon his physical examination, "there appears to be nothing that would impair in participating in educational, social, and recreational activities" (T. 567). However, Dr. Prezio stated that his assessment "needs the additional input from his pediatricians and specialty examiners who have evaluated this young man" (T. 567-68).[10]

---

[9] It was noted that due to vision difficulties, any visual representation used during the assessment had to be held within two feet of his eyes to ensure that he saw and focused on the object (T. 252).

[10] Dr. Prezio also stated that H.S.J.'s prognosis was guarded due to his congenital chromosomal abnormality (T. 567).

The record also includes a non-examining report from Dr. San-Jose Santos dated September 6, 2011 (T. 576). Dr. Santos references Dr. Prezio's report, as well as Ms. Pensyl's teacher questionnaire and H.S.J.'s "current eye exam" on July 12, 2011. Id.[11] He concludes that H.S.J. has no limitation in his ability to acquire and use information, attend and complete tasks, interact and relate to others, or to care for himself (T. 579-80). Dr. Santos stated that H.S.J. had a less than marked limitation in his ability to move about and manipulate objects and in his health and well-being (T. 580).

On October 12, 2012, H.S.J. was seen by Dr. Erika Wexler at the Strong Child Neurology Clinic to evaluate pain he was experiencing in his feet (T. 647). Dr. Wexler found that the pain was caused by cramps in his feet and was not due to any seizure disorder (T. 649).

In October 2012, H.S.J. was seen by Dr. Kassas for behavioral concerns expressed by his parents (T. 691). He was said to have been hitting himself and his sister, throwing things, breaking things, pulling the dog's ears and otherwise being abusive to the family dog. Id. Dr. Kassas stated that the "patient and parents need to pursue anger management and counseling" (T. 692).

Dr. Craig Zuckerman conducted a psychological evaluation of H.S.J. on January 7, 2013 and January 14, 2013 (T. 709-10). Upon examination, his IQ was scored at 121 under the Stanford-Binet Intelligence Scale, placing him in the "high average range at better than 92% of age-mates" (T. 710). Although his mother's description of his behavior placed him in the bottom two percent (id.)[12], ratings by his teacher "fell in the average range on all measures" (T. 711). Dr. Zuckerman stated that H.S.J. appeared to meet the criteria for Oppositional Defiant Disorder

---

[11]   That eye exam was with Dr. Gearinger (T. 703).

[12]   Dr. Zuckerman stated that he observed parent-child interaction between plaintiff and H.S.J., and that while H.S.J. sat quietly during free play and interacted well with his mom, he often made "refusal comments or ignored his mother" when she attempted to gain compliance (T. 711). He stated that "[t]here was use of questions by the mom, more often than firm commands". Id.

and suggested continuation of special education services, as well as family therapy to "systemically address family relationships". Id.

H.S.J. was examined by Dr. Abigail Kroening on April 30, 2013 for a further behavior health assessment (T. 736-759). H.S.J.'s mother and step-father stated that he would become defiant, wet himself, and scream (T. 749). Dr. Kroening stated that H.S.J., who was not yet five years old, has an above average IQ and a history of "significant behavioral dysregulation, predominantly in the home setting" (T. 736). It was noted that H.S.J. "does well in the school setting. His behaviors are within normal limits and he responds well to classroom structure and limits. There are no behavioral concerns in school" (T. 751).[13] She stated that H.S.J. was "appropriately social during the visit today, with clear communicative intent and great use of gestures" (T. 737). Dr. Kroening recommended that H.S.J. see a child psychiatrist or psychologist, and that his school increase the time he spends in a typical classroom. Id.

## ANALYSIS

**A.    Standard of Review**

The Social Security Act provides that a child under the age of 18 is disabled if he/she meets the following definition. "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §1382c(a)(3)(C)(i). Additionally, no child "who engages in substantial gainful activity . . . may be considered to be disabled". 42 U.S.C. §1382c(a)(3)(C)(ii).

---

[13]    Indeed, a "quarterly assessment" from the Allegany County Youth Bureau, Children with Special Needs Preschool Program states that he was doing "extremely well" and that his individual consultation sessions should be reduced from four times a month to twice a month (T. 761). It was stated that H.S.J. "is a sweet boy and it has been a pleasure working with him". Id.

- 6 -

To make a disability determination, the combined effect of all impairments on health and functioning are considered. 20 C.F.R. §416.924(a). Specifically, the ALJ undertakes the following analysis to determine disability. First, if a child can perform "substantial gainful activity", that child is deemed not disabled. If a child cannot perform substantial gainful activity, the ALJ considers "physical or mental impairment(s) first to see if [the child has] an impairment or combination of impairments that is severe". Id. If the impairment is not severe, the child is not disabled. If the impairment is severe, further review is conducted to determine if the impairment "meets, medically equals, or functionally equals the listings". Id. See 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Appendix 1 Listings"); see also 20 C.F.R. §416.925. If the child has an impairment that appears in the Appendix 1 Listings for at least 12 months, the child qualifies as disabled. Id.

If the applicant does not have an impairment that meets the Appendix 1 Listings, a child will still be deemed disabled if the impairment functionally equals the impairments of one of the listings. In other words, the impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. §416.926a(a). Pursuant to 20 C.F.R. §416.926a(b)(1), the six domains used to evaluate a child's functioning are:

> 1) Acquiring and Using Information: This domain considers "how well [the child] acquires and learns information, and how well [the child] uses information learned". 20 C.F.R. §416.926a(g).
>
> 2) Attending and Completing Tasks: This domain requires that "we consider how well [the child] [is] able to focus and maintain [their] attention, and how well [the child] [can] begin, carry through, and finish [their] activities, including the pace at which [they] perform activities and the ease with which [they] change them". 20 C.F.R. §416.926a(h).

> 3) <u>Interacting and Relating with Others:</u>  This domain considers "how well [the child] initiate[s] and sustain[s] emotional connections with others, develop[s] and use[s] the language of [his/her] community, cooperate[s] with others, compl[ies] with rules, respond[s] to criticism, and respect[s] and take[s] care of the possessions of others". 20 C.F.R. §416.926a(i).
>
> 4) <u>Moving about and Manipulating Objects:</u>  This domain considers "how [the child] move[s] [his/her] body from one place to another and how [he/she] move[s] and manipulate[s] things". 20 C.F.R. §416.926a(j).
>
> 5) <u>Self-care Activities:</u>  This domain considers "how well [the child] maintain[s] a healthy emotional and physical state, including how well [the child] get [s] [his/her] physical and emotional wants and needs met in appropriate ways; how [the child] cope[s] with stress and changes in [his/her] environment; and whether [the child] take[s] care of [his/her] own health, possessions, and living area". 20 C.F.R. §416.926a (k).
>
> 6) <u>Health and Physical Well-being:</u> This domain considers "the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [the child's] functioning that we did not consider in paragraph (j) of this section". 20 C.F.R. §416.926a (l).

The SSA regulations provide that an impairment is of "marked" limitation when:

> [The] impairment interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities. [The child's] day-to-day functioning may be seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme". It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. §416.926a(e)(2)(i).

The SSA regulations provide that an impairment is an "extreme" limitation when:

> [The] impairment interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities. [The child's] day-to-day functioning may be very seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked" . . . [but] does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. §416.926a(e)(3)(i).

The Acting Commissioner must consider all relevant information to assess the child's functioning. This may include medical sources-pediatricians, psychologists, qualified speech-language pathologists, physical, occupational, and rehabilitation therapists-as well as non-medical sources such as parents, teachers, and other individuals who know the child. 20 C.F.R. §416.924a(a). Additionally, the Acting Commissioner must consider the impact of chronic illness and limitations that interfere with the child's activities over time, as well as the effects of treatment, including medications, on the child's functioning. 20 C.F.R. §§416.924a(b)(8)-(9). The burden of proof rests on the claimant at each step. See McNeil v. Colvin, 2015 WL 4662795, *5 (W.D.N.Y. 2015).

**B.      ALJ Straub's Assessment of H.S.J.'s Visual Impairment**

The plaintiff argues that ALJ Straub failed to properly evaluate H.S.J.'s visual impairment. Plaintiff's Memorandum of Law [7-1], pp. 16-21. Plaintiff points to the fact that ALJ Straub referred to H.S.J.'s condition as a "macular disorder" and not a nystagmus caused by foveal hypoplasia. Id. at p. 16. Plaintiff also argues that ALJ Straub did not identify which, if

any, of the Appendix 1 listings he reviewed when considering H.S.J.'s visual impairment (id. at p. 21), and improperly relied upon the consultative reports. Id. at p. 21-28.

Although ALJ Straub characterized H.S.J.'s visual impairment as a "macular disorder",[14] his decision reflects that he appropriately considered H.S.J.'s nystagmus. ALJ Straub referred to the condition as a nystagmus on at least four occasions in his decision (T. 22, 29). He also summarized plaintiff's testimony that H.S.J.'s vision difficulties impair "every aspect of his life", that he had two surgeries related to the nystagmus, has to wear sunglasses due to light sensitivity, and that his vison allegedly hinders his attention span (T. 25).

ALJ Straub also considered H.S.J.'s visual restriction when making his findings in the functional domains of attending and completing tasks (T. 25), moving about and manipulating objects (T. 27), and health and physical well-being (T. 29). ALJ Straub properly relied upon the various intelligence evaluations (T. 710), teacher assessments (T. 216-22), and consultative reports (T. 564, 576) in making these findings, as well as in finding that H.S.J. has no limitations in acquiring and using information (T. 24), interacting and relating with others (T. 26)[15], or caring for himself (T. 28).

Plaintiff's testimony regarding H.S.J.'s physical limitations due to his visual impairment, including that he walks into walls and things "constantly" and has to "scoot down" stairs on his rear (T. 44) is not consistent with the medical record. The report by Dr. Wexler states that H.S.J. could walk up the stairs one foot per stair (holding onto a railing), and ride a bike with training wheels (T. 648). H.S.J.'s pediatrician, Dr. Kassas, noted that at two years old

---

[14] In light of Dr. Gearinger's description of H.S.J.'s condition as being a mild to moderate foveal hypoplasia of his macula (T. 561), referring to it as a macular disorder is not inaccurate.

[15] The reports of H.S.J.'s behavioral concerns do suggest that he may have some issue with respect to his ability to interact and relate with others. The record reflects, however, that these behavioral issues only involve his interaction with his family in the home setting. It does not appear that these issues, based on this record, amount to a "marked" limitation as defined under the regulations. In any event, the finding of a marked limitation in this one area would not alter the disability determination as determined by ALJ Straub.

plaintiff was "full of energy" trying to climb up and down the examining table (T. 346) and was a "healthy appearing child . . . running around the room playing, talking and enjoying himself" (T. 335). When H.S.J. was four years old, Dr. Kassas noted that he could descend stairs alternating feet, pedal a tricycle, stack eight blocks, and help get himself dressed (T. 684).

    Plaintiff's assertion that ALJ Straub erred by placing any reliance upon the reports of Dr. Prezio and Dr. Santos is not persuasive. As noted above, ALJ Straub relied upon various evaluations and teacher assessments, and not exclusively on the consultative reports, in making his findings as to H.S.J.'s functional abilities. In any event, the reports of Dr. Prezio and Dr. Santos are appropriately limited by deference to H.S.J.'s treating physicians, and are consistent with the medical record as a whole. While plaintiff argues that Dr. Prezio's report acknowledged that his opinion should be gauged by the reports from H.S.J.'s treating physicians, plaintiff points to no such reports with findings contradicting Dr. Prezio's conclusions. Indeed, plaintiff cites no report from Dr. Kassas or Dr. Gearinger which suggests that H.S.J.'s visual impairment is more limiting than as suggested by Dr. Prezio and Dr. Santos.

    Plaintiff also argues that ALJ Straub should have obtained a residual functional capacity evaluation from Dr. Gearinger and Dr. Kassas. Plaintiff's Memorandum of Law [7-1], pp. 19, 26. Dr. Gearinger, through plaintiff's attorney, did submit a residual functional capacity assessment. However, in that report he stated that he did not evaluate H.S.J. for any limitations in the functional domains (T. 720). Although the record includes hundreds of pages of reports from Dr. Kassas, plaintiff does not cite any clinical finding by Dr. Kassas which would suggest that H.S.J.'s visual impairment would markedly restrict him in any functional domain. "Plaintiff has otherwise failed to identify any information to suggest that additional expert testimony or additional information from any of Plaintiff's treating physicians might have led the ALJ to reach a different conclusion". Ortiz v. Colvin, 2014 WL 3784108, *7 (W.D.N.Y. 2014). Under

such circumstances, ALJ Straub did not err by failing to further develop the record as to H.S.J.'s visual impairment.[16]

Finally, plaintiff argues that ALJ Straub erred by failing to expressly state which of the Appendix 1 listings he considered. Plaintiff's Memorandum of Law [7-1], p. 21. "While Appendix 1 must be considered in making a disability determination, it is not required that the [Acting Commissioner] mechanically recite the evidence leading to her determination". Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir.1986)). Moreover, it is the plaintiff's burden to prove the existence of a disability under the listings. Glavan v. Barnhart, 2004 WL 2326384, *7 (E.D.N.Y. 2004). Here, plaintiff makes no argument that H.S.J.'s visual impairment meets any specific listing in Appendix 1. Hairston v. Comm'r of Soc. Sec., 2015 WL 4633935, *6 (E.D. Mich. 2015) ("The Commissioner points out, however, that plaintiff fails to specify any specific Listing under which the ALJ improperly evaluated her, or to identify any record medical evidence that would compel a finding that she met or equaled a Listing").

Substantial evidence supports ALJ Straub's determination that H.S.J. is not disabled at this time.

**C.    Failure to Make a Credibility Finding**

Plaintiff argues that ALJ Straub failed to properly evaluate the credibility of plaintiff's testimony regarding H.S.J.'s limitations. Plaintiff's Memorandum of Law [7-1], p. 28. With respect to plaintiff's testimony, ALJ Straub stated that "[a]fter considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning

---

[16]    Plaintiff also suggests that the behavioral issues noted by Dr. Zuckerman and Dr. Kroening suggest that "H.S.J.'s impairments were evolving and worsening as he aged". Plaintiff's Memorandum of Law [7-1], p. 25. It may be that H.S.J.'s symptoms may worsen as he ages. In that event, plaintiff may re-apply for benefits for H.S.J. However, the current record contains substantial evidence supporting ALJ Straub's determination that plaintiff is not disabled at this time.

the intensity, persistence and limiting effects of these symptoms are not entirely credible" (T. 23).

Just prior to making this somewhat conclusory assessment, ALJ Straub summarized some of the evidence in the record which is inconsistent with plaintiff's testimony concerning H.S.J.'s functional ability. For example, although plaintiff testified that his visual impairment affected every aspect of H.S.J.'s life, ALJ Straub pointed to clinical evidence that H.S.J. could fix and follow with both eyes, he possessed average language and articulation skills, his gross and fine motor skills were normal, he could ride a bike with training wheels, his IQ was above average, and he was doing well in school (T. 22-23).

Although he does not provide detailed analysis, ALJ Straub's rationale with respect to the credibility of plaintiff's testimony is evident from the decision as a whole. His failure to assign a specific weight to plaintiff's testimony is harmless error. Phelps v. Colvin, 20 F. Supp. 3d 392, 405 (W.D.N.Y. 2014) ("The ALJ's credibility determination as to Ms. Matthew's testimony is supported by substantial evidence and does not warrant remand").

## CONCLUSION

For these reasons, I recommend that plaintiff's motion for judgment on the pleadings [7] be denied and that the Acting Commissioner's motion for judgement on the pleadings [13] be granted.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by January 17, 2017 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C) and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . .

waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: January 3, 2017

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge